IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| MELINDA GRISIER, | ) | CASE NO. 3:15-cv-02052 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Melinda Grisier ("Plaintiff" or "Grisier") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

Grisier protectively filed an application for DIB on September 19, 2012.[1]  Tr. 93, 184-187, 201-202.  Grisier alleged a disability onset date of December 31, 2007 (Tr. 51, 93, 184, 201, and alleged disability due to depression, post-traumatic stress disorder, anxiety, seizures, dislocated discs, back pain, and bi-polar disorder (Tr. 51, 65, 106, 112, 206).  After initial denial by the state agency (Tr. 106-108) and denial upon reconsideration (Tr. 112-118), Grisier requested a hearing (Tr. 119).  A hearing was held before Administrative Law Judge Yvette N. Diamond ("ALJ") on July 11, 2014.  Tr. 7-50.

In her August 14, 2014, decision (Tr. 90-105), the ALJ determined that Grisier was not under a disability from December 31, 2007, through June 30, 2010, her date last insured (Tr. 93, 99-100).  Grisier requested review of the ALJ's decision by the Appeals Council.  Tr. 1-2.  On August 11, 2015, the Appeals Council denied Grisier's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 3-6.

## II. Evidence

### A.      Personal, educational, and vocational evidence

Grisier was born in 1970 and was 43 years old at the time of the hearing.  Tr. 13, 184, 201.  Grisier attended school up until the tenth grade.  Tr. 15.  She is able to read and write.  Tr. 15.

At the time of the hearing, Grisier was married and living with her husband. Tr. 13-14.  Her two stepdaughters lived with them on occasion.  Tr. 14.  She has two adult children, ages 25

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 9/26/2016).

and 22 at the time of the hearing.  Tr. 14.  She also has grandchildren.  Tr. 14.  She was previously married.  Tr. 14, 385.  During the period of time between December 31, 2007, and June 30, 2010, Grisier was married to a previous husband and living with him.  Tr. 14-15.

Grisier last worked in 2011 at a Domino's in Georgia.  Tr. 16.  She worked there for two weeks delivering pizzas.  Tr. 16.  Her job at Domino's ended because she moved from Georgia to Ohio.  Tr. 38.  Grisier does not think that she would have been able to sustain that job even if she had not moved to Ohio because it was hard for her to stand on her feet.  Tr. 38-39.  She also worked at a Marco's making and delivering pizzas[2] (Tr. 16-17) and had other past work, including working as a cashier in a store, a cashier in a drive through, and a gas station attendant (Tr. 17-20).

## B.      Medical evidence[3]

In April 2005, Grisier was injured while working at a drive-through store.  Tr. 289.  She was stacking some beverages and 12-packs fell on her back.  Tr. 289.  Grisier sought and received treatment for the injury to her back, including physical therapy.  Tr. 289-290, 307-309. During a consult with Dr. Larry Kennedy, M.D., on July 8, 2005, for her back injury, Dr. Kennedy noted that Grisier indicated she was "currently seeking disability and, in fact, she does not have a goal for returning to any work place."  Tr. 289.  Dr. Kennedy concluded that Grisier's prognosis was "poor for improvement, particularly when apparently it is in her best interest to remain disabled in order to obtain disability, which apparently is her goal."  Tr. 290.  Dr. Kennedy advised that, if disability was Grisier's goal, he did not think physical therapy or other

---

[2] It is not entirely clear when Grisier worked at Marco's but it appears she worked there for a few years and stopped working there in early 2008.  Tr. 16, 196.  Grisier stopped working at Marco's because of alleged harassment.  Tr. 18, 39.  She also reports experiencing harassment while working at Domino's.  Tr. 39.

[3] Plaintiff's challenge to the ALJ's decision is based primarily on her alleged mental impairment and the ALJ's consideration and weighing of the December 21, 2012, opinion of consultative examining psychologist Dr. Neil S. Shamberg, Ph.D.  She also challenges the ALJ's credibility assessment.

treatment would help her but, if she wanted to get better, he thought she could.  Tr. 290.   On July 26, 2005, physical therapy was discontinued due to Grisier's lack of attendance.  Tr. 307.  In March 2006, Grisier returned to see her primary care physician Dr. Diane Conrad, M.D., due to a flare up in her acute lumbar strain.  Tr. 287.   She reported that she had started to feel better with the physical therapy sessions and time but had recently been doing some light pizza delivery work and was experiencing bilateral lower back pain.  Tr. 287.  Grisier planned to return to physical therapy and was provided prescriptions for Naprosyn and Flexeril.  Tr. 287.  Dr. Conrad also suggested that Grisier follow up with Dr. Kennedy.  Tr. 287.  During the visit, Grisier complained of headaches.  Tr. 287.  Dr. Conrad agreed to work with Grisier regarding her headaches, noting they would have to plan an evaluation outside of her workers compensation claim.  Tr. 287.

After her date last insured,[4] following a family dispute at home, on January 10, 2012, Grisier sought emergency room treatment.  Tr. 392-422.  She reported having been going through a lot of stress due to various issues but mainly she was having a difficult time managing her 19-year old child.  Tr. 396.  Grisier complained of chest pain, she was shaking all over, and having problems sleeping.  Tr. 396.   Grisier also reported that she had previously sprained her left ankle.  Tr. 396.  Her medical history was documented as "[h]istory of syncope with stress, seizures, cervical cancer."  Tr. 396.  The emergency room physician diagnosed anxiety, hyperventilation, and sprained left ankle. Tr. 397.  Grisier was treated for her sprained ankle, given Ativan, and advised to follow up with her family physician and take some time off from work and rest.[5]  Tr. 397.

---

[4] Plaintiff has not identified mental health treatment records for the relevant period of December 31, 2007, the alleged disability onset date, through June 30, 2010, the date last insured.

[5] Although advised to take time off from work, it is not clear whether Grisier was employed at this time.

On April 10, 2012, following a March 22, 2012, sexual assault by a male whom Grisier met online, Grisier sought outpatient therapy at the Maumee Valley Guidance Center to reduce symptoms of depressive disorder, NOS, and PTSD.  Tr. 328-329.  She relayed that she was also sexually assaulted at age 15.  Tr. 328.  She reported a history of intermittent depression and was interested in counseling to overcome her issues.  Tr. 328.  Anne Mallett, MSW, LISW, the therapist conducting the initial session with Grisier diagnosed depressive disorder, NOS, and PTSD.  Tr. 329.  She assessed a GAF score of 50.[6]  Tr. 329.

During an April 28, 2012, emergency room visit, Grisier complained of anxiety, a seizure and chest pain.  Tr. 447-473.  Grisier reported that she had gotten into an argument with her daughter.  Tr. 450.  Grisier indicated that she had become anxious and when she gets anxious she has seizures.  Tr. 450, 452.  The emergency room notes reflect a history of syncope with stress and anxiety, a hole in her heart, cancer and pseudoseizures.  Tr. 452.  Grisier was diagnosed with having an anxiety attack and was advised to follow up with her family doctor.  Tr. 453.

On September 10, 2012, Grisier's therapy at Maumee Valley Guidance Center was terminated because Grisier had not returned and attempts to contact her were not successful.[7]  Tr. 381-382.  The discharge summary shows that Grisier had made some progress and it was noted that if Grisier felt that she would benefit from treatment in the future she was welcome to return.  Tr. 381.

---

[6] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*  With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

[7] During her consultative evaluation (discussed more fully below), Grisier reported that she had stopped therapy because of a lack of transportation.  Tr. 386.

On December 12, 2012, Dr. Neil S. Shamberg, Ph.D., conducted a consultative psychological evaluation.  Tr. 384-390.  Most of the information provided to Dr. Shamberg was based on Grisier's self-reports during the interview that Dr. Shamberg conducted.  Tr. 384.  Dr. Shamberg found Grisier's reliability to be very good based on there being good internal consistency and a close correspondence between collateral data and Grisier's own self-reports.  Tr. 389.  Grisier relayed that she had been married and divorced twice, with both ex-husbands being abusive.  Tr. 389.  Dr. Shamberg diagnosed Grisier with major depressive disorder, recurrent, currently severe, with some psychotic features; post-traumatic stress disorder; panic disorder with agoraphobia; social phobia; and anxiety disorder, NOS.  Tr. 388.  Dr. Shamberg indicated that Grisier also suffered from psychosocial and environmental problems, noting that she was still haunted by her abusive ex-husbands and two rapes; she had problems with her daughter-in-law; and she was worried that her doctors had not come up with a cause for her panic attacks and seizures.  Tr. 389.  Dr. Shamberg assigned a GAF score of 45.  Tr. 389.  He assessed Grisier's functional abilities, opining that:

> When you combine her sub-average intelligence, lack of a high school diploma, reading comprehension problems, untreated major depression, and a host of anxiety issues in this young woman, you see that [Grisier] would have very, very significant limitations in understanding, as well as remembering and carrying out most job instructions, as she is right now.

> During the Adult Clinical Interview yesterday . . . [Grisier], in spite of some hearing problems in her right ear, showed few limitations with regard to maintaining attention and concentration; however if she were to try a simple job now, let alone a more complex job, her depression and host of anxiety disorders would interfere significantly with her ability to attend, to concentrate, to keep up the work pace, and to persist and finish most job tasks now.

> She is reporting fear of other people, and merits a diagnosis of Social Phobia.  She hides all day every day in her small apartment in Bryan, Ohio.  She hasn't worked for five years; in this psychologist's opinion [Grisier] would have huge problems now, based on her various fears and phobias, with regard to responding appropriately to all supervisors and to most coworkers, in all work settings.  She

also has a history with two abusive ex-husbands, and left her job at Marco's Pizza five years ago because of "sexual harassment by my manager; that sticks with me."

Given her slowness and lack of motivation, due to an untreated current major depression, and given her wide variety of anxiety disorders, also untreated at the present time, it is this psychologist's opinion that this claimant would have very, very significant limitations right now on all jobs with regard to her ability to respond appropriately to most work pressures.

Tr. 390.

On January 16, 2013, state agency reviewing psychologist Tonnie Hoyle, Psy.D., completed two psychiatric review techniques (a PRT and PRT2) (Tr. 58-60) and mental RFC (Tr. 60-61). The PRT was for the date last insured of June 30, 2010, and the PRT2 was a "current evaluation." Tr. 58. For the PRT, Dr. Hoyle concluded that there was no medically determinable mental impairment established, noting there was no medical evidence available from December 31, 2007, through June 30, 2010. Tr. 58. For the PRT2, Dr. Hoyle concluded that Grisier had moderate restrictions in activities of daily living and in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace. Tr. 59. Dr. Hoyle gave great weight to Dr. Shamberg's December 21, 2012, opinion which provided "current clinical findings and observations." Tr. 60. Dr. Hoyle also completed a mental RFC which was a "current evaluation." Tr. 60-61. In that mental RFC, Dr. Hoyle concluded that Grisier was markedly limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 61. Dr. Hoyle also opined that she expected that Grisier's anxiety symptoms would interfere with her ability to consistently perform even simple routine work activities on a sustained basis. Tr. 61.

On reconsideration, on April 4, 2013, state agency reviewing psychologist Kristen Haskins, Psy.D., completed a psychiatric review technique, finding that there was no medically determinable mental impairment established prior to the date last insured of June 30, 2010. Tr. 72. As did Dr. Hoyle, Dr. Haskins indicated that there was no medical evidence available from December 31, 2007, through June 30, 2010. Tr. 72. Dr. Haskins gave great weight to Dr. Shamberg's December 21, 2012, opinion which provided "current clinical findings and observations." Tr. 73. Dr. Haskins did not complete a mental RFC. Tr. 73.

**C.    Plaintiff's testimony**

Grisier testified and was represented at the hearing by an attorney. Tr. 9-10, 13-39. In 2005, while working at a drive-through store, Grisier was injured while stocking the coolers. Tr. 20-21. Someone had not properly stacked 12-packs of pop and, when Grisier was bending down to pick of bottles of pop to stock, she bumped the improperly stocked 12-packs of pop and they fell on her. Tr. 21. She suffered injuries to her back and legs. Tr. 21. Grisier went to the emergency room and she did some physical therapy. Tr. 21.

Grisier was seeing a neurologist, Dr. Chang, for seizures but stopped seeing him shortly before the administrative hearing that was held in July 2014 because Dr. Chang felt that there was nothing further he could do for Grisier's seizures. Tr. 22. Grisier indicated that Dr. Chang advised her that her seizures were not based on epilepsy but rather were based on how she was treated in the past and were mental health related. Tr. 22. She still continues to have seizures but is not always sure when she is having one or how long they last. Tr. 25.

Grisier stated she was supposed to be seeing a psychiatrist or therapist but she had not made any appointments as of July 11, 2014, the hearing date. Tr. 23. Grisier's primary care

physician Dr. Reiter[8] was prescribing Grisier medicine for anxiety and depression.  Tr. 21, 23-24.  Grisier was seeing Dr. Reiter every couple months but was trying to cut back on seeing doctors.  Tr. 24.  Her anxiety and depression medicine helped some but not all the time.  Tr. 24.  She has some side-effects from her anxiety and depression medicine, noting that it makes her jittery and sometimes she is nauseated.  Tr. 24-25.

During the period of time between December 31, 2007, and June 30, 2010, Grisier was not always able to take a shower and get dressed by herself because she had trouble getting motivated and being able to walk. Tr. 26.  She has been able to gradually increase her ability to do things on her own.  Tr. 26.  She helped care for her children at times and took care of two cats.  Tr. 26.  She was able to take care of household chores such as cleaning, dusting and vacuuming but had a difficult time doing so.  Tr. 26-27, 30-31.  She would start chores and have to stop and rest for 15-20 minutes before starting back up again.  Tr. 31.  She would take Tylenol to help with the pain and try to start up her chores again.  Tr. 31.  Her husband at the time took care of the grocery shopping, errands and paying bills. Tr. 27.  He was controlling and did not want her to leave the house.  Tr. 27, 38.  Her husband would leave her a list of chores and tell her when the chores would need to be completed.  Tr. 31.  If she did not follow her husband's instructions, he would hit her.[9]  Tr. 31.  Grisier experienced bad days approximately 3 days each week, with pain in her lower back and into her legs.  Tr. 32-33.  When she was having bad days, she still attempted to complete her chores or she would call a neighbor to help her because she was scared of her husband.  Tr. 33.  She also has had headaches 1-2 times every 2-3 weeks.  Tr. 33.  She associated her headaches with being hit in the head.  Tr. 33-34.  Grisier has managed her headaches with Tylenol and a heating pack.  Tr. 33-34.  Grisier had difficulties sitting because of

---

[8] Grisier had been seeing Dr. Conrad but started seeing Dr. Reiter a few months prior to the hearing.  Tr. 21

[9] Her other ex-husband had also hit her.  Tr. 31.

a pinched nerve in her back.  Tr. 35-36.  She had to move herself around to adjust her body and

try to stretch.  Tr. 36.  After sitting for a while, Grisier would have difficulty getting up.  Tr. 36.

She would have to hold on to a chair or table or have people assist her up.  Tr. 36.  Once up, she

would have to move around for 10-20 minutes before sitting back down.  Tr. 36.  Grisier did

attend church each week with neighbors.  Tr. 28.  As a hobby, Grisier collected knick-knacks.

Tr. 28.

Grisier did not have health insurance when she was initially going through treatment for

her back so she mostly paid out of pocket for her medical care.  Tr. 37.  Her husband initially

allowed her to get treatment for her back but eventually he did not let her continue with

treatment because he did not want to pay the bills.  Tr. 37-38.

**D.  Vocational expert's testimony**

Vocational Expert Joey M. Kilpatrick ("VE") testified at the hearing.  Tr. 39-49, 93, 180-

182.  The VE described Grisier's past work, including (1) a pizza delivery driver, an SVP 2,[10]

medium level job as defined and light as performed; (2) a kitchen helper, an SVP 2, medium

level job as defined and light as performed; (3) a fast food worker, an SVP 2, light level job as

defined and as performed; (4) a cashier II, an SVP 2, light level job; (5) an automobile service

station attendant, an SVP 3, medium level job as defined and as performed; and (6) a food sales

clerk, an SVP 3, light level job, as defined and as performed.  Tr. 41-42.

The ALJ asked the VE to assume a hypothetical individual of Grisier's age and with her

education and work experience and with the following limitations: lift and carry 20 pounds

occasionally and 10 pounds frequently; stand or walk for 6 out of 8 hours; sit for 6 out of 8

---

[10] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

hours; frequently push or pull; frequently climb stairs, balance, stoop, kneel, crouch, and crawl; no climbing ladders; and no exposure to hazards (moving machinery and unprotected heights). Tr. 42.  The ALJ then asked the VE whether the described individual would be able to perform Grisier's past relevant work.  Tr. 42.  The VE indicated that the described individual could perform the fast food worker, cashier II, and food sales clerk positions as generally performed and as actually performed.  Tr. 42-43.  The VE also indicated that the described individual could perform Grisier's past work as a kitchen helper as Grisier performed that position.  Tr. 43.

With the addition of a sit or stand at will option, the VE indicated that the hypothetical individual would not be able to perform Grisier's past relevant work but there would be light level jobs in the region or nation that the hypothetical worker with the sit/stand at will option could perform, including information clerk, ticket seller, and mail clerk.[11]  Tr. 43-45.

The ALJ asked the VE for information regarding customary tolerances for unexcused absences and allowances for breaks.  Tr. 45.  The VE explained that 1½ days per month is an acceptable amount of unexcused absences – 2 days or more is not.  Tr. 45.  As far as breaks, the VE indicated typical breaks include a 15 minute break after 1 hour and 45 minutes of work and a 30-60 minute break after 4 hours of work.  Tr. 45.  The VE also indicated that being off-task 15% of more of the time during an 8-hour day is not acceptable.  Tr. 45.

In response to questions from Grisier's counsel, the VE indicated that in the light semi-skilled and unskilled and sedentary semi-skilled and unskilled occupational bases, normally, there might be an allowance for one unscheduled break a day for 10 minutes or less.  Tr. 46.  Counsel asked the VE to assume a hypothetical individual who would have to be reminded by a supervisor every 15 minutes to stay on task and whether there would be competitive employment for that individual.  Tr. 46.  The VE responded that such a limitation would not be tolerated in

[11] The VE provided job incidence data for the identified jobs.  Tr. 44-45

the national or regional economy.  Tr. 46.  Counsel then asked the VE whether there would be any jobs available to a hypothetical individual limited as follows: light work, only unilateral hearing, no peripheral left vision and no binocular vision, sit/stand at will, no crouching, crawling, and kneeling, no bending at the waist, no detailed instructions (i.e., limited to simple and routine work processes), only incidental contact with the general public, supervisors, and coworkers, and unable to accept instructions from supervisors.  Tr. 47.  The VE indicated that there would be no jobs available in the national or regional economy.  Tr. 47.  In response to further questioning by Grisier's counsel, the VE indicated that the most preclusive limitation contained in that hypothetical was the inability to work around supervisors or take instructions. Tr. 48.  Finally, Grisier's counsel asked the VE hypotheticals regarding sit/stand options to which the VE responded that, if an individual needed to change positions four times every hour, work would be available so long as that was the only limitation and the individual did not have to leave her work station.  Tr. 48.  If, however, an individual had to take a 10 minute break once or twice an hour and leave the work station every time she changed a position, such a limitation would preclude all employment.  Tr. 48-49.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her August 14, 2014, decision, the ALJ made the following findings:[12]

1.    Grisier met the insured status requirements through June 30, 2010.  Tr. 95.

2.    Grisier did not engage in substantial gainful activity during the period from her alleged onset date of December 31, 2007, through her date last insured of June 30, 2010.  Tr. 95.

3.    Grisier had the following severe impairment: degenerative disc disease.[13] Tr. 95.

4.    Grisier did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 96.

5.    Grisier had the RFC to perform light work except she could lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk for 6 hours out of 8 hours; sit for 6 out of 8 hours; frequently push and pull; frequently climb stairs, balance, stoop, kneel, crouch, and crawl but only occasionally climb ladders; and no exposure to hazards.  Tr. 96-98.

6.    Through the date last insured, Grisier was capable of performing past relevant work as a kitchen helper and food sales clerk.  Tr. 98-99.

Based on the foregoing, the ALJ determined that Grisier had not been under a disability from December 31, 2007, the alleged onset date, through June 30, 2010, the date last insured. Tr. 99.

## V. Parties' Arguments

Grisier argues that the ALJ erred in assigning little weight to the opinion of consultative psychologist Dr. Neil Shamberg.  Doc. 12, pp. 11-14.  Grisier contends that, when reducing the

---

[12] The ALJ's findings are summarized.

[13] The ALJ found no evidence or diagnosis of seizure activity before or during the period from Grisier's alleged onset date to her date last insured.  Tr. 95.

weight assigned to Dr. Shamberg's opinion on the basis that the opinion covered a time period after Grisier's date last insured and because Grisier did not have psychiatric symptoms prior to the date last insured, the ALJ failed to take into account that, during the relevant period, Grisier was under the control of an abusive husband who would not allow her to see medical providers. Doc. 12, p. 11.  Further, Grisier contends that, if the ALJ believed that Dr. Shamberg's opinion was an insufficient analysis of the period pre-dating Grisier's date last insured, the ALJ had a duty to further develop the record and seek clarification from the consultative examiner.  Doc. 12, p. 13.  Grisier also argues that the VE hypothetical was faulty because it did not accurately portray her mental health limitations.  Doc. 12, p. 14.

Also, Grisier contends that the ALJ erred in relying on her activities of daily living when discounting her credibility.  Doc. 12, pp. 14-15.  She contends that, since her daily activities were conducted in an environment of domestic violence, the ALJ improperly concluded that she engaged in "a somewhat normal level of daily activity and interaction."  Doc. 12, p. 14.  She also argues that the ALJ improperly equated daily activities with work.  Doc. 12, p. 15.

In response to Grisier's arguments regarding the ALJ's consideration of Dr. Shamberg's opinion, the Commissioner notes that Grisier does not challenge the ALJ's Step Two finding that Grisier did not have a severe mental impairment.  Doc. 16, pp. 5-6.  Additionally, the Commissioner argues that the ALJ properly weighed and provided sufficient reasons for discounting Dr. Shamberg's opinion and the ALJ did not err in her duty to develop the record. Doc. 16, pp. 6-9.  Since the ALJ did not adopt Dr. Shamberg's opinion and did not find that Grisier had a mental health impairment, the Commissioner argues that Grisier's claim that the VE hypothetical did not adequately portray Grisier's mental health limitations is without merit. Doc. 16, p. 9.

Regarding the ALJ's credibility assessment, the Commissioner argues that the ALJ reasonably considered Grisier's daily activities when assessing her credibility and the ALJ's credibility assessment is supported by substantial evidence. Doc. 16, pp. 9-12.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**A.**    **The ALJ properly considered and weighed the opinion of consultative examining psychologist Dr. Shamberg**

Grisier argues that the ALJ did not properly weigh the opinion of consultative examining psychologist Dr. Shamberg because the ALJ's reasons for providing little weight to Dr.

Shamberg's opinion did not take into account the impact that her abusive ex-husband's behavior had on her daily activities and access to health care during the relevant period, i.e., December 31, 2007, through June 30, 2010. Doc. 12, pp. 11-14.

As a one-time examining psychologist, Dr. Shamberg did not have an ongoing treatment relationship with Grisier and therefore his opinion was not entitled to deference or controlling weight under the treating physician rule. *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005). It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 404.1527. *See* 20 C.F.R. § 404.1527(c). Those factors include (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Id.* However, even when the opinion at issue was rendered by a treating physician, which is not the situation in this case, the ALJ is not obliged to include in his decision an exhaustive factor-by-factor analysis of the factors. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

The Regulations also make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a); 404.1546(c). It is the responsibility of the ALJ, not a physician, to assess a claimant's RFC. *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). In assessing a claimant's RFC, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*

Although Dr. Shamberg was not a treating psychologist, consistent with the Regulations, as discussed more fully below, the ALJ's decision makes clear that the ALJ considered Dr. Shamberg's opinion and explained the weight assigned to his opinion, stating:

> [A]t DDS request, Neil Shamberg, Ph.D., performed a psychological consultative evaluation on December 21, 2012.  (Exhibit 6F).  In her mental status examination, the claimant had poor eye contact, a depressed mood, a flat affect, low average intellectual functioning, and fidgeting and trembling behavior. However, she also had average insight and judgment and logical, coherent, and goal directed thought process.  Dr. Shamberg diagnosed major depressive disorder, posttraumatic stress disorder, panic disorder, social phobia, and anxiety disorder.  He opined that the claimant would have significant limitations in social interaction, responding to work pressures, maintaining attention and concentration, and understanding, remembering, and carrying out instructions. This opinion is granted little weight pursuant to 20 CFR 404.1527, as it is based on an examination years after the claimant's date last insured.  Additionally, it is not supported by medical evidence of record during the relevant period because no doctor diagnosed a medically determinable impairment between December 31, 2007 and June 30, 2010.  In fact, the claimant did not even have any subjective complaints of psychiatrically based symptoms during this time.

Tr. 98.

The ALJ did not ignore portions of Dr. Shamberg's opinion.  The ALJ's consideration of the fact that Dr. Shamberg's opinion was based on an examination of Grisier that post-dated the relevant period by more than two years was not improper.  *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990) ("In order to establish entitled to disability insurance benefits, an individual must establish that he became 'disabled' prior to the expiration of his insured status."); *see also* 20 C.F.R. § 404.1527(c)(4)-(6)  (An ALJ may consider consistency and supportability as well as other factors that tend to support or contradict an opinion).  Further, the ALJ's conclusion that there was no evidence of a medically determinable mental impairment during the relevant period

is supported by the record.[14]  *See* Tr. 58, 72 (state agency reviewing psychologist psychiatric review techniques finding no medical evidence available from December 31, 2007, through June 20, 2010, and no mental medically determinable impairments established prior to date last insured).  Additionally, in reaching her decision, the ALJ considered Grisier's testimony that, during the relevant period, Grisier had been in an abusive relationship.  Tr. 97.   Thus, contrary to Grisier's suggestion, the ALJ did not ignore the fact that Grisier was under the control of an abusive husband during the relevant period.

Based on the foregoing, Grisier has failed to demonstrate that the ALJ's consideration of, and decision to discount, Dr. Shamberg's opinion was improper.

Additionally, Grisier's claim that the ALJ had a duty to seek further clarification from Dr. Shamberg is also without merit.  Grisier was represented by counsel and Grisier has shown no heightened duty to develop the record.

Grisier's claim that the ALJ improperly played doctor by discounting Dr. Shamberg's opinion is also without merit.  It is true that an "ALJ may not substitute his opinion for that of a physician[.]"  *Poe*, 342 Fed. Appx. at 157.  However, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding."  *Id.*   Here, the ALJ did not substitute her judgment for the opinion of a physician that was supported by the medical evidence.  As the ALJ concluded, there was no medical evidence documenting a medically determinable mental impairment during the relevant period.   Additionally, as reflected in his evaluation, Dr. Shamberg's opinion speaks to Grisier's abilities at the time the opinion was rendered, i.e., in December 2012.  *See e.g.*, Tr. 390 (Dr. Shamberg offering his opinion as to how Grisier is "<u>right now</u>;" opining that Grisier would

---

[14] Grisier has not separately challenged the Step Two finding, which found only one severe physical impairment and no severe mental impairments.  Tr. 95.

have "huge problems <u>now</u>;" and opining that Grisier would have "very, very significant limitations <u>right now</u>") (emphasis supplied).

Finally, Grisier's claim that the VE's testimony cannot serve as substantial evidence because the VE did not adequately describe her mental health limitations is also without merit. The VE testimony upon which the ALJ relied was provided in response to a hypothetical question that accurately portrayed the limitations found to be credible and supported by the evidence and contained in the RFC.   The ALJ found no basis for including mental limitations in the RFC and Grisier has neither challenged nor demonstrated error with respect to this determination.  Accordingly, the VE's testimony constitutes substantial evidence on which the Commissioner was entitled to rely to support the finding of no disability.  *See Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

**B.**     **The ALJ properly relied upon evidence regarding Grisier's activities of daily living when assessing her credibility**

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and

aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-7p").  "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

The ALJ concluded that the Grisier's activities of daily living diminished the credibility of the allegations of her functional limitations.  Tr. 97.  More particularly, the ALJ explained:

> Despite her impairments, the claimant engaged in a somewhat normal level of daily activity interaction.  During the relevant period, the claimant admitted daily activities including household chores such as cleaning, dusting, vacuuming, and ironing.  She cared for her two children and her two cats.  She cooked occasionally for her family and attended church on Sundays with neighbors. Additionally, she could have gone grocery shopping, but her husband would not allow her to do so.  The claimant collected stuffed animals.  Some of the physical and mental abilities and social limitations required in order to perform these activities are the same as those necessary for obtaining and maintaining employment.  I find the claimant's ability to participate in such activities diminishes the credibility of the claimant's allegations of functional limitations.

Tr. 97.

Grisier does not deny that she was able to and did perform the cited activities of daily living.  Rather, she argues that, because Grisier performed daily activities in the context of an abusive and controlling relationship, which is not normal, the ALJ incorrectly concluded that Grisier had "engaged in a somewhat normal level of daily activity and interaction."  Doc. 11, pp.

21

14-15.  However, Grisier's disagreement with the ALJ's description of her activity as a
"somewhat normal level of daily activity and interaction" is not a sufficient basis upon which to
conclude that the ALJ's credibility assessment is flawed or improper.

The ALJ did not ignore the fact that Grisier performed the cited activities of daily living
in the context of an abusive relationship and that she was controlled by her ex-husband.  *See* Tr.
97 (ALJ noting that, "[d]uring the relevant period, she lived with her former husband who was
abusive towards her" and "she could have gone grocery shopping, but her husband would not
allow her to do so.").  In assessing Grisier's allegations, the ALJ considered not only activities of
daily living but also took into account other evidence, including Grisier's own acknowledgement
that she had very little treatment between December 31, 2007, and June 20, 2010.  Tr. 96-97.
Also, contrary to Grisier's suggestion, the ALJ did not conclude that, because Grisier performed
the cited activities of daily living activity, she could work.  Rather, the ALJ was providing
further explanation as to why she found Grisier's allegations regarding her functional limitations
not fully credible and assessed Grisier's RFC based on all relevant evidence. Based on her
assessment of Grisier's RFC and VE testimony, the ALJ reached the conclusion that through her
date last insured Grisier was able to perform her past relevant work as kitchen helper and food
sales clerk.  Tr. 99.

While Grisier disagrees with the ALJ's credibility assessment, she has not shown that the
ALJ's reliance upon her activities of daily living when assessing her credibility was contrary to
the Regulations or not supported by substantial evidence. *See Jones*, 336 F.3d at 476 (In
reviewing an ALJ's credibility determination, a court is "limited to evaluating whether or not the
ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported
by substantial evidence in the record.").  Moreover, to the extent that Grisier seeks to have this

Court reassess her credibility, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

September 26, 2016

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).