UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Melinda Grisier,  Case No. 3:15-cv-2052

      Plaintiff

   v.  MEMORANDUM OPINION

Commissioner of Social Security,

      Defendant

This matter is before me on Plaintiff's objections (Doc. No. 19) to the September 26, 2016 Report and Recommendation of the Magistrate Judge (Doc. No. 17). Also before me is the Defendant's response to Plaintiff's objections. (Doc. No. 20).

As there are no objections to the procedural history, evidence, medical evidence, plaintiff's testimony and the vocational expert's testimony of the Report, I adopt it in its entirety.

## I. Procedural History

Grisier protectively filed an application for DIB on September 19, 2012.[1] Tr. 93, 184-187, 201-202. Grisier alleged a disability onset date of December 31, 2007 (Tr. 51, 93, 184, 201, and alleged disability due to depression, post-traumatic stress disorder, anxiety, seizures, dislocated discs, back pain, and bi-polar disorder (Tr. 51, 65, 106, 112, 206). After initial denial by the state agency (Tr. 106-108) and denial upon reconsideration (Tr. 112-118), Grisier requested a hearing (Tr. 119). A hearing was held before Administrative Law Judge Yvette N. Diamond ("ALJ") on July 11, 2014. Tr. 7-50.
In her August 14, 2014, decision (Tr. 90-105), the ALJ determined that Grisier was not under a disability from December 31, 2007, through June 30, 2010, her date last insured (Tr. 93, 99-100). Grisier requested review of the ALJ's decision by the Appeals Council. Tr. 1-2. On

---

[1] The Social Security Administration explains that "protective filing date" is "[t]he date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 9/26/2016).

August 11, 2015, the Appeals Council denied Grisier's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 3-6.

## II. Evidence

### A. Personal, educational, and vocational evidence

Grisier was born in 1970 and was 43 years old at the time of the hearing. Tr. 13, 184, 201. Grisier attended school up until the tenth grade. Tr. 15. She is able to read and write. Tr. 15.

At the time of the hearing, Grisier was married and living with her husband. Tr. 13-14. Her two stepdaughters lived with them on occasion. Tr. 14. She has two adult children, ages 25 and 22 at the time of the hearing. Tr. 14. She also has grandchildren. Tr. 14. She was previously married. Tr. 14, 385. During the period of time between December 31, 2007, and June 30, 2010, Grisier was married to a previous husband and living with him. Tr. 14-15.

Grisier last worked in 2011 at a Domino's in Georgia. Tr. 16. She worked there for two weeks delivering pizzas. Tr. 16. Her job at Domino's ended because she moved from Georgia to Ohio. Tr. 38. Grisier does not think that she would have been able to sustain that job even if she had not moved to Ohio because it was hard for her to stand on her feet. Tr. 38-39. She also worked at a Marco's making and delivering pizzas[2] (Tr. 16-17) and had other past work, including working as a cashier in a store, a cashier in a drive through, and a gas station attendant (Tr. 17-20).

### B. Medical evidence[3]

In April 2005, Grisier was injured while working at a drive-through store. Tr. 289. She was stacking some beverages and 12-packs fell on her back. Tr. 289. Grisier sought and received treatment for the injury to her back, including physical therapy. Tr. 289-290, 307-309. During a consult with Dr. Larry Kennedy, M.D., on July 8, 2005, for her back injury, Dr. Kennedy noted that Grisier indicated she was "currently seeking disability and, in fact, she does not have a goal for returning to any work place." Tr. 289. Dr. Kennedy concluded that Grisier's prognosis was "poor for improvement, particularly when apparently it is in her best interest to remain disabled in order to obtain disability, which apparently is her goal." Tr. 290. Dr. Kennedy advised that, if disability was Grisier's goal, he did not think physical therapy or other treatment would help her but, if she wanted to get better, he thought she could. Tr. 290. On July 26, 2005, physical therapy was discontinued due to Grisier's lack of attendance. Tr. 307. In March 2006, Grisier returned to see her primary care physician Dr. Diane Conrad, M.D., due to a flare up in her acute lumbar strain. Tr. 287. She reported that she had started to feel better with the physical therapy sessions and time but had recently been doing some light pizza delivery work and was experiencing bilateral lower back pain. Tr. 287. Grisier planned to return to physical therapy and was provided prescriptions for Naprosyn and Flexeril. Tr. 287. Dr. Conrad also suggested that Grisier follow up with Dr. Kennedy. Tr. 287. During the visit, Grisier

---

[2] It is not entirely clear when Grisier worked at Marco's but it appears she worked there for a few years and stopped working there in early 2008. Tr. 16, 196. Grisier stopped working at Marco's because of alleged harassment. Tr. 18, 39. She also reports experiencing harassment while working at Domino's. Tr. 39.

[3] Plaintiff's challenge to the ALJ's decision is based primarily on her alleged mental impairment and the ALJ's consideration and weighing of the December 21, 2012, opinion of consultative examining psychologist Dr. Neil S. Shamberg, Ph.D. She also challenges the ALJ's credibility assessment.

2

complained of headaches. Tr. 287. Dr. Conrad agreed to work with Grisier regarding her headaches, noting they would have to plan an evaluation outside of her workers compensation claim. Tr. 287.

After her date last insured,[4] following a family dispute at home, on January 10, 2012, Grisier sought emergency room treatment. Tr. 392-422. She reported having been going through a lot of stress due to various issues but mainly she was having a difficult time managing her 19-year old child. Tr. 396. Grisier complained of chest pain, she was shaking all over, and having problems sleeping. Tr. 396. Grisier also reported that she had previously sprained her left ankle. Tr. 396. Her medical history was documented as "[h]istory of syncope with stress, seizures, cervical cancer." Tr. 396. The emergency room physician diagnosed anxiety, hyperventilation, and sprained left ankle. Tr. 397. Grisier was treated for her sprained ankle, given Ativan, and advised to follow up with her family physician and take some time off from work and rest.[5] Tr. 397.

On April 10, 2012, following a March 22, 2012, sexual assault by a male whom Grisier met online, Grisier sought outpatient therapy at the Maumee Valley Guidance Center to reduce symptoms of depressive disorder, NOS, and PTSD. Tr. 328-329. She relayed that she was also sexually assaulted at age 15. Tr. 328. She reported a history of intermittent depression and was interested in counseling to overcome her issues. Tr. 328. Anne Mallett, MSW, LISW, the therapist conducting the initial session with Grisier diagnosed depressive disorder, NOS, and PTSD. Tr. 329. She assessed a GAF score of 50.[6] Tr. 329.

During an April 28, 2012, emergency room visit, Grisier complained of anxiety, a seizure and chest pain. Tr. 447-473. Grisier reported that she had gotten into an argument with her daughter. Tr. 450. Grisier indicated that she had become anxious and when she gets anxious she has seizures. Tr. 450, 452. The emergency room notes reflect a history of syncope with stress and anxiety, a hole in her heart, cancer and pseudoseizures. Tr. 452. Grisier was diagnosed with having an anxiety attack and was advised to follow up with her family doctor. Tr. 453.

On September 10, 2012, Grisier's therapy at Maumee Valley Guidance Center was terminated because Grisier had not returned and attempts to contact her were not successful.[7] Tr. 381-382. The discharge summary shows that Grisier had made some progress and it was noted that if Grisier felt that she would benefit from treatment in the future she was welcome to return. Tr. 381.

On December 12, 2012, Dr. Neil S. Shamberg, Ph.D., conducted a consultative psychological evaluation. Tr. 384-390. Most of the information provided to Dr. Shamberg was based on Grisier's self-reports during the interview that Dr. Shamberg conducted. Tr. 384. Dr. Shamberg found Grisier's reliability to be very good based on there being good internal consistency and a close correspondence between collateral data and Grisier's own self-reports.

---

[4] Plaintiff has not identified mental health treatment records for the relevant period of December 31, 2007, the alleged disability onset date, through June 30, 2010, the date last insured.

[5] Although advised to take time off from work, it is not clear whether Grisier was employed at this time.

[6] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.* With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

[7] During her consultative evaluation (discussed more fully below), Grisier reported that she had stopped therapy because of a lack of transportation. Tr. 386.

3

Tr. 389. Grisier relayed that she had been married and divorced twice, with both ex-husbands being abusive. Tr. 389. Dr. Shamberg diagnosed Grisier with major depressive disorder, recurrent, currently severe, with some psychotic features; post-traumatic stress disorder; panic disorder with agoraphobia; social phobia; and anxiety disorder, NOS. Tr. 388. Dr. Shamberg indicated that Grisier also suffered from psychosocial and environmental problems, noting that she was still haunted by her abusive ex-husbands and two rapes; she had problems with her daughter-in-law; and she was worried that her doctors had not come up with a cause for her panic attacks and seizures. Tr. 389. Dr. Shamberg assigned a GAF score of 45. Tr. 389. He assessed Grisier's functional abilities, opining that:

> When you combine her sub-average intelligence, lack of a high school diploma, reading comprehension problems, untreated major depression, and a host of anxiety issues in this young woman, you see that [Grisier] would have very, very significant limitations in understanding, as well as remembering and carrying out most job instructions, as she is right now.
>
> During the Adult Clinical Interview yesterday . . . [Grisier], in spite of some hearing problems in her right ear, showed few limitations with regard to maintaining attention and concentration; however if she were to try a simple job now, let alone a more complex job, her depression and host of anxiety disorders would interfere significantly with her ability to attend, to concentrate, to keep up the work pace, and to persist and finish most job tasks now.
>
> She is reporting fear of other people, and merits a diagnosis of Social Phobia. She hides all day every day in her small apartment in Bryan, Ohio. She hasn't worked for five years; in this psychologist's opinion [Grisier] would have huge problems now, based on her various fears and phobias, with regard to responding appropriately to all supervisors and to most coworkers, in all work settings. She also has a history with two abusive ex-husbands, and left her job at Marco's Pizza five years ago because of "sexual harassment by my manager; that sticks with me."
>
> Given her slowness and lack of motivation, due to an untreated current major depression, and given her wide variety of anxiety disorders, also untreated at the present time, it is this psychologist's opinion that this claimant would have very, very significant limitations right now on all jobs with regard to her ability to respond appropriately to most work pressures.

Tr. 390.

On January 16, 2013, state agency reviewing psychologist Tonnie Hoyle, Psy.D., completed two psychiatric review techniques (a PRT and PRT2) (Tr. 58-60) and mental RFC (Tr. 60-61). The PRT was for the date last insured of June 30, 2010, and the PRT2 was a "current evaluation." Tr. 58. For the PRT, Dr. Hoyle concluded that there was no medically determinable mental impairment established, noting there was no medical evidence available from December 31, 2007, through June 30, 2010. Tr. 58. For the PRT2, Dr. Hoyle concluded that Grisier had moderate restrictions in activities of daily living and in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace. Tr. 59. Dr. Hoyle gave great weight to Dr. Shamberg's December 21, 2012, opinion which provided "current clinical findings and observations." Tr. 60. Dr. Hoyle also completed a mental RFC which was a "current evaluation." Tr. 60-61. In that mental RFC, Dr. Hoyle concluded that

4

Grisier was markedly limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 61. Dr. Hoyle also opined that she expected that Grisier's anxiety symptoms would interfere with her ability to consistently perform even simple routine work activities on a sustained basis. Tr. 61.

On reconsideration, on April 4, 2013, state agency reviewing psychologist Kristen Haskins, Psy.D., completed a psychiatric review technique, finding that there was no medically determinable mental impairment established prior to the date last insured of June 30, 2010. Tr. 72. As did Dr. Hoyle, Dr. Haskins indicated that there was no medical evidence available from December 31, 2007, through June 30, 2010. Tr. 72. Dr. Haskins gave great weight to Dr. Shamberg's December 21, 2012, opinion which provided "current clinical findings and observations." Tr. 73. Dr. Haskins did not complete a mental RFC. Tr. 73.

## C. Plaintiff's testimony

Grisier testified and was represented at the hearing by an attorney. Tr. 9-10, 13-39. In 2005, while working at a drive-through store, Grisier was injured while stocking the coolers. Tr. 20-21. Someone had not properly stacked 12-packs of pop and, when Grisier was bending down to pick of bottles of pop to stock, she bumped the improperly stocked 12-packs of pop and they fell on her. Tr. 21. She suffered injuries to her back and legs. Tr. 21. Grisier went to the emergency room and she did some physical therapy. Tr. 21.

Grisier was seeing a neurologist, Dr. Chang, for seizures but stopped seeing him shortly before the administrative hearing that was held in July 2014 because Dr. Chang felt that there was nothing further he could do for Grisier's seizures. Tr. 22. Grisier indicated that Dr. Chang advised her that her seizures were not based on epilepsy but rather were based on how she was treated in the past and were mental health related. Tr. 22. She still continues to have seizures but is not always sure when she is having one or how long they last. Tr. 25.

Grisier stated she was supposed to be seeing a psychiatrist or therapist but she had not made any appointments as of July 11, 2014, the hearing date. Tr. 23. Grisier's primary care physician Dr. Reiter[8] was prescribing Grisier medicine for anxiety and depression. Tr. 21, 23-24. Grisier was seeing Dr. Reiter every couple months but was trying to cut back on seeing doctors. Tr. 24. Her anxiety and depression medicine helped some but not all the time. Tr. 24. She has some side-effects from her anxiety and depression medicine, noting that it makes her jittery and sometimes she is nauseated. Tr. 24-25.

During the period of time between December 31, 2007, and June 30, 2010, Grisier was not always able to take a shower and get dressed by herself because she had trouble getting motivated and being able to walk. Tr. 26. She has been able to gradually increase her ability to do things on her own. Tr. 26. She helped care for her children at times and took care of two cats. Tr. 26. She was able to take care of household chores such as cleaning, dusting and vacuuming but had a difficult time doing so. Tr. 26-27, 30-31. She would start chores and have to stop and rest for 15-20 minutes before starting back up again. Tr. 31. She would take Tylenol to help with the pain and try to start up her chores again. Tr. 31. Her husband at the time took care of the grocery shopping, errands and paying bills. Tr. 27. He was controlling and did not want her to leave the house. Tr. 27, 38. Her husband would leave her a list of chores and tell her when the chores would need to be completed. Tr. 31. If she did not follow her husband's instructions, he would hit her.[9] Tr. 31. Grisier experienced bad days approximately 3 days each

---

[8] Grisier had been seeing Dr. Conrad but started seeing Dr. Reiter a few months prior to the hearing. Tr. 21

[9] Her other ex-husband had also hit her. Tr. 31.

5

week, with pain in her lower back and into her legs. Tr. 32-33. When she was having bad days, she still attempted to complete her chores or she would call a neighbor to help her because she was scared of her husband. Tr. 33. She also has had headaches 1-2 times every 2-3 weeks. Tr. 33. She associated her headaches with being hit in the head. Tr. 33-34. Grisier has managed her headaches with Tylenol and a heating pack. Tr. 33-34. Grisier had difficulties sitting because of a pinched nerve in her back. Tr. 35-36. She had to move herself around to adjust her body and try to stretch. Tr. 36. After sitting for a while, Grisier would have difficulty getting up. Tr. 36. She would have to hold on to a chair or table or have people assist her up. Tr. 36. Once up, she would have to move around for 10-20 minutes before sitting back down. Tr. 36. Grisier did attend church each week with neighbors. Tr. 28. As a hobby, Grisier collected knick-knacks. Tr. 28.

Grisier did not have health insurance when she was initially going through treatment for her back so she mostly paid out of pocket for her medical care. Tr. 37. Her husband initially allowed her to get treatment for her back but eventually he did not let her continue with treatment because he did not want to pay the bills. Tr. 37-38.

### D.     Vocational expert's testimony

Vocational Expert Joey M. Kilpatrick ("VE") testified at the hearing. Tr. 39-49, 93, 180-182. The VE described Grisier's past work, including (1) a pizza delivery driver, an SVP 2,[10] medium level job as defined and light as performed; (2) a kitchen helper, an SVP 2, medium level job as defined and light as performed; (3) a fast food worker, an SVP 2, light level job as defined and as performed; (4) a cashier II, an SVP 2, light level job; (5) an automobile service station attendant, an SVP 3, medium level job as defined and as performed; and (6) a food sales clerk, an SVP 3, light level job, as defined and as performed. Tr. 41-42.

The ALJ asked the VE to assume a hypothetical individual of Grisier's age and with her education and work experience and with the following limitations: lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk for 6 out of 8 hours; sit for 6 out of 8 hours; frequently push or pull; frequently climb stairs, balance, stoop, kneel, crouch, and crawl; no climbing ladders; and no exposure to hazards (moving machinery and unprotected heights). Tr. 42. The ALJ then asked the VE whether the described individual would be able to perform Grisier's past relevant work. Tr. 42. The VE indicated that the described individual could perform the fast food worker, cashier II, and food sales clerk positions as generally performed and as actually performed. Tr. 42-43. The VE also indicated that the described individual could perform Grisier's past work as a kitchen helper as Grisier performed that position. Tr. 43.

With the addition of a sit or stand at will option, the VE indicated that the hypothetical individual would not be able to perform Grisier's past relevant work but there would be light level jobs in the region or nation that the hypothetical worker with the sit/stand at will option could perform, including information clerk, ticket seller, and mail clerk.[11] Tr. 43-45.

The ALJ asked the VE for information regarding customary tolerances for unexcused 7absences and allowances for breaks. Tr. 45. The VE explained that 1½ days per month is an acceptable amount of unexcused absences – 2 days or more is not. Tr. 45. As far as breaks, the VE indicated typical breaks include a 15 minute break after 1 hour and 45 minutes of work and a

---

[10] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin. December 4, 2000). Using the skill level definitions in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an **SVP** of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT. *Id.*

[11] The VE provided job incidence data for the identified jobs. Tr. 44-45

30-60 minute break after 4 hours of work. Tr. 45. The VE also indicated that being off-task 15% of more of the time during an 8-hour day is not acceptable. Tr. 45.

In response to questions from Grisier's counsel, the VE indicated that in the light semi-skilled and unskilled and sedentary semi-skilled and unskilled occupational bases, normally, there might be an allowance for one unscheduled break a day for 10 minutes or less. Tr. 46. Counsel asked the VE to assume a hypothetical individual who would have to be reminded by a supervisor every 15 minutes to stay on task and whether there would be competitive employment for that individual. Tr. 46. The VE responded that such a limitation would not be tolerated in the national or regional economy. Tr. 46. Counsel then asked the VE whether there would be any jobs available to a hypothetical individual limited as follows: light work, only unilateral hearing, no peripheral left vision and no binocular vision, sit/stand at will, no crouching, crawling, and kneeling, no bending at the waist, no detailed instructions (i.e., limited to simple and routine work processes), only incidental contact with the general public, supervisors, and coworkers, and unable to accept instructions from supervisors. Tr. 47. The VE indicated that there would be no jobs available in the national or regional economy. Tr. 47. In response to further questioning by Grisier's counsel, the VE indicated that the most preclusive limitation contained in that hypothetical was the inability to work around supervisors or take instructions. Tr. 48. Finally, Grisier's counsel asked the VE hypotheticals regarding sit/stand options to which the VE responded that, if an individual needed to change positions four times every hour, work would be available so long as that was the only limitation and the individual did not have to leave her work station. Tr. 48. If, however, an individual had to take a 10 minute break once or twice an hour and leave the work station every time she changed a position, such a limitation would preclude all employment. Tr. 48-49.

(Doc. No. 17 at pp. 2-12).

## STANDARD OF REVIEW

A district court must conduct a *de novo* review of "any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject or modify the recommended disposition, receive further evidence, or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); *see also Norman v. Astrue*, 694 F.Supp.2d 738, 740 (N.D. Ohio 2010).

The district judge "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Colvin v. Barnhart*, 475 F.3d

7

727, 730 (6th Cir. 2007) (*quoting Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001)). If the Commissioner's findings of fact are supported by substantial evidence, those findings are conclusive. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).

**PLAINTIFF'S OBJECTIONS**

Plaintiff asserts two objections to the Report, namely, that the ALJ erred: (1) in analyzing and weighing mental health opinions, including setting aside a psychological consultative exam as untimely when the facts on which it was based were longstanding; and (2) by relying on daily activities extracted arbitrarily in hearing in a way that values the psychological judgment of a psychiatrist over a psychologist as to psychological impact on daily activities. (Doc. No. 19 at p. 10).

As to her first objection, Plaintiff states the ALJ failed to give the proper weight to Dr. Neil S. Shamberg's consultative opinion. I disagree.

Consultative opinions and the evaluation of opinion evidence are addressed in 20 C.F.R. § 404.1527(e), entitled Evidence from our Federal or State agency medical or psychological consultants: "The rules in § 404.1513a apply except when an administrative law judge gives controlling weight to a treating source's medical opinion, the administrative law judge is not required to explain in the decision the weight he or she gave to the prior administrative medical findings in the claim." The policy interpretation behind this and related provisions is explained as follows:

> Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions. . . .
>
> *The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.* For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for opinions, than are required of treating sources.

8

> For this reason, *the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record,* considering such factors as supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program or psychologist. The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.
>
> In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source's medical opinion if the State agency medical or phychological [sic] consultant's opinion is based on a review of a complete case record that includes a medical report form a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

SSR 96-6p, 1996 WL 374180 at *2. (Emphasis added).

In this case, the ALJ did consider Dr. Shamberg's evidence as follows:

> As for the opinion evidence, at DDS request, Neil Shamberg, Ph.D. performed a psychological consultative examination on December 21, 2012. (Exhibit 6F). In her mental status examination, the claimant had poor eye contact, a depressed mood, a flat affect, low average intellectual functioning, and fidgeting and trembling behavior. However, she also had average insight and judgment and logical, coherent, and goal directed thought process. Dr. Shamberg diagnosed major depressive disorder, posttraumatic stress disorder, panic disorder, social phobia, and anxiety disorder. He opined that the claimant would have significant limitations in social interaction, responding to work pressures, maintaining attention and concentration, and interaction, responding to work pressures, maintaining attention and concentration, and understanding, remembering, and carrying out instructions. This opinion is granted little weight pursuant to 20 C.R.R. 404.1527, as it is based on an examination years after the claimant's date last insured. Additionally, it is not supported by medical evidence of record during the relevant period because no doctor diagnosed a medically determinable mental impairment between December 31, 2007 and June 30, 2010. In fact, the claimant did not even have any subjective complaints of psychiatrically based symptoms during this time.

(Doc. No. 11 at p. 102).

While the ALJ did not entirely reject Dr. Shamberg's opinion, she properly accorded it less weight because Dr. Shamberg was not a treating physician, the consultative examination occurred two years after the insured status period began, and the record did not contain evidence of a medically determinable mental impairment during the relevant period.  This is in accord with the current standard in the Sixth Circuit.  *See Ealy v. Commissioner of Social Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (report of psychologist who conducted consultative examination was not afforded controlling weight as her conclusions were not supported by her own materials, the record as a whole).   I find the Plaintiff's objections not well taken.

Plaintiff's second objection takes aim at the ALJ's reliance on daily activities "extracted arbitrarily in hearing in a way that values the psychological judgment of a psychiatrist over a psychologist as to psychological impact on daily activities." (Doc. No. 19 at p. 2).  The Plaintiff takes issue with the "rhetorical force in the ALJ's opinion about daily activities" as not an accurate accounting of her prior activities "extracted from Grisier at [the] hearing, but in the prominently-cited psychological judgment of physical-medicine specialist (or physiatrist [sic]) Larry Kennedy, M.D."  Stated differently, the Plaintiff's objection takes issue with the ALJ's treatment of her testimony of her daily activities and the impact to on her ability to be capable of work.  I disagree.

The applicable policy [12] interpretation addressing the evaluation of symptoms in disability claims, including assessing the credibility of an individual's statements states in pertinent part:

> 4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.  An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

---

[12] This ruling was superseded by SSR 16-3p, 2016 WL 119029 which took effect on March 16, 2016.

10

SSR 96-7p, 1996 WL 374186 at *1.

The hearing transcript contains a thorough examination by Plaintiff's counsel of Ms. Grisier about her daily activities and the physical and emotional constraints related to those activities. The ALJ found Plaintiff's "ability to participate in such activities diminishe[d] the credibility of the claimant's allegations of functional limitations." (Doc. No. 11 at p. 101). The ALJ also had the benefit of the records of not only the treating physicians but the consultative professionals, many of whom commented on her level of functionality.

The ALJ found the objective medical evidence as well as the Plaintiff's self-reporting did not support her subjective allegations. This included Plaintiff's medical records, records of her treatment for back pain by Dr. Diane Conrad, M.D., and evaluation by Dr. Larry Kennedy, M.D., and the opinion evidence of Dr. Neil Shamberg, Ph.D. In addition to the medical evidence and the Plaintiff's testimony, the ALJ considered her past relevant work, the VE's testimony as to jobs available with the relevant restrictions. Given that record, the ALJ concluded Plaintiff's residual functional capacity did not preclude her form performing work-related activities:

> In sum, the objective medical evidence within the record does not support the claimant's subjective allegations. Instead, a comprehensive review of all the documented medical evidence, including the objective findings and diagnostic test results, taking into account the claimant's self-reporting and subjective allegations as analyzed above, dictates the above, less than light, residual functional capacity.

(Doc. No. 11 at p. 102).

In assessing the existence of substantial evidence, the standard is deferential and requires affirming the Commissioner's decision, even if a reviewing court would come to a different conclusion. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

Based upon the record before the ALJ and the hearing transcript, I find the ALJ's determination is supported by substantial evidence. *See Her v. Commissioner of Social Sec.*, 203 F.3d

11

388, 389-90 (6th Cir. 1999) (even where the evidence could support another conclusion, the ALJ's decision must stand if evidence reasonably supports the ALJ's conclusion).

## CONCLUSION

For the reasons stated above, the Plaintiff's objections are overruled and the September 26, 2016 Report and Recommendation (Doc. No. 17) is adopted as the Order of this Court. The Commissioner's decision is affirmed.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge